CAMBRIDGE ELECTRIC LIGHT COMPANY & others *vs.*
DEPARTMENT OF PUBLIC UTILITIES
(and a companion case[1]).

Suffolk. December 4, 1972. — April 23, 1973.

Present: TAURO, C.J., REARDON, HENNESSEY, & KAPLAN, JJ.

*Public Utilities. Regulation. State Administrative Procedure Act. Administrative Matter. Notice. Constitutional Law,* Due process of law, Right to hearing. *Equity Jurisdiction,* Public utilities. *Equity Pleading and Practice,* Intervention. *Words,* "Regulation," "Specifically named persons."

A proceeding before the Department of Public Utilities, culminating after notice and public hearings in regulations as to billing and

---

[1] Massachusetts Electric Company & others *vs.* Department of Public Utilities.

termination procedures for nonseasonal residential customers of gas and electric companies, which complemented the department's statutory functions, was regulatory under the State Administrative Procedure Act, G. L. c. 30A, not "adjudicatory" [485–487]; there was no merit in a claim that because the hearings were not conducted as quasi judicial hearings, and because the "legal rights, duties or privileges" of the companies were materially affected, their constitutional rights were infringed [488].

The fact that in a proceeding on proposed regulations the Department of Public Utilities mailed notices of its public hearings to persons listed on the mailing list kept pursuant to G. L. c. 30A, §§ 2 (1), 3 (1), did not indicate that the recipients were "specifically named persons" within § 1 (1), or that the proceeding was "adjudicatory" rather than regulatory. [489]

A proceeding before the Department of Public Utilities was not stamped as "adjudicatory" under G.L. c. 30A, § 1 (1), rather than as regulatory, by the fact that at its public hearings its chairman stated that if affiants who executed affidavits received in evidence were not produced for cross-examination that factor would be taken into account in ascribing weight to the affidavits. [489]

G. L. c. 30A, §§ 11 (8) and 14 (8), apply to decisions reached by administrative agencies in "adjudicatory" proceedings, not to regulations promulgated by an administrative agency after regulatory proceedings; a routine judicial inquiry into the statutory authority of an agency to issue regulations did not require the court to check back on the agency's "reasons" and "determination[s]" of fact and law. [490–493]

In proceedings challenging regulations adopted by the Department of Public Utilities, any noncompliance by it with the record keeping requirements of G. L. c. 30A, § 11A, may be rectified by the department's making an accurate record of the vote to adopt. [493]

Regulations adopted by the Department of Public Utilities as to billing and termination procedures for nonseasonal residential customers of gas and electric companies were authorized by G. L. c. 164, § 76C, empowering the department to adopt "reasonable" regulations "consistent with," and "necessary to carry out the administration" of, c. 164; the regulations and particular sections of c. 164 cited by the companies were not in conflict but were complementary. [493–496]

Regulations adopted by the Department of Public Utilities but not yet put into operation were not deemed arbitrary on their face by this court with respect to a ban on gas and electric companies from cutting off service to customers for nonpayment of disputed portions of bills pending resolution of the disputes, with respect to the department interposing itself as impartial umpire in customer-company disputes, or with respect to directives as to the details of meter reading and billing [496–498]; nor could the regulations be condemned beforehand as confiscatory [498–499].

A dispute as to the propriety of bills rendered by gas or electric companies to customers would place in issue "the legal rights, duties or privileges of specifically named persons" within G. L. c. 30A, § 1 (1), and proposed regulations by the Department of Public Utilities, providing that a customer disputing a bill may so notify

the company and upon receipt of an adverse decision from ts complant officer may appeal to the department for an investigation, including a hearing by its representative and a final departmental decision, should also provide for an "adjudicatory proceeding" under §§ 10–11 before the department at a stage to be determined by it in the regulations. [499–501]

Under § 7 of G. L. c. 30A, the State Administrative Procedure Act, judicial review of "regulations" promulgated by the Department of Public Utilities affecting gas and electric companies and their customers was properly sought by a proceeding for declaratory relief under c. 231A, § 2. [502]

The judicial review provided by G. L. c. 25, § 5, is inapplicable to regulations formulated by the Department of Public Utilities, and is designed to provide judicial review of administrative proceedings of the adjudicatory or similar type. [502–504]

It was within the discretion of a single justice of this court hearing proceedings challenging the validity of regulations promulgated by the Department of Public Utilities affecting gas and electric companies and their customers to allow Massachusetts Law Reform Institute, which had originally framed the regulations, and Massachusetts Welfare Rights Organization to intervene in the proceedings. [504]

PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on December 31, 1970, January 5, 1971, January 7, 1971, and January 13, 1971.

BILL IN EQUITY filed in the above court on January 12, 1971.

The cases were consolidated and reserved and reported without decision by *Braucher*, J.

*Edwin J. Carr (Marshall S. Davis & William C. Hardy* with him) for Cambridge Electric Light Company & others; *Richard L. Morningstar*, for Western Massachusetts Electric Company, also with him.

*Philip H. R. Cahill* for Massachusetts Electric Company & others.

*Andrew M. Wolfe*, Assistant Attorney General, for the Department of Public Utilities.

*John Bowman* for Massachusetts Law Reform Institute & another, interveners.

*John J. Desmond, III*, for Boston Edison Company, and *Joseph P. Rooney & Robert D. Canty*, for Brockton Edison Company & another, joined in a brief.

KAPLAN, J.   The petitioners, eighteen gas or electric utility corporations within the jurisdiction of the respondent Department of Public Utilities (department), seek to annul certain regulations dealing with billing of customers and termination of service approved and promulgated by the department after public hearings. The petitioners have made their challenge in the form of several petitions for appeal in the county court under the provisions of G. L. c. 25, § 5.   Because of uncertainty about whether appeal under that statute is the correct avenue for judicial review of the department's action, nine of the petitioners have, in addition, lodged in the county court a bill for declaratory relief against the department under G. L. c. 30A, § 7, and G. L. c. 231A, § 2, seeking a declaration of invalidity of the regulations. The single justice on motion consolidated the appeals and reserved and reported that case without decision to the full court.   He similarly reserved and reported the case for declaratory relief, and finally consolidated the two cases for hearing.   By order of the single justice, the Massachusetts Law Reform Institute (MLRI)[2] and Massachusetts Welfare Rights Organization (MWRO)[3] were permitted to intervene and they have participated in argument before this court.   Operation of the regulations was stayed pending disposition of the suits.

A. *Proceedings before the department.*   We first describe the departmental proceedings as they appear from the record made there and incorporated in the reservation and report.

On November 18, 1969, the department commenced its proceeding numbered D.P.U. 16386 by issuing a proposal under § 2 of the Administrative Procedure Act (G. L. c. 30A, § 2) to adopt a regulation to fix the

---

[2] An organization funded by the Office of Economic Opportunity working on common problems of legal service organizations in the Commonwealth.

[3] A membership organization sponsoring the interests of welfare recipients.

rate of interest to be paid by gas, water, electric, telephone and telegraph companies upon deposits made by their customers. On the same date the department instituted its proceeding numbered D.P.U. 16386A by issuing a further proposal under § 2 to adopt regulations, originally drafted by the intervener MLRI, applicable to the same classes of companies, regarding deposits by customers and meter reading, billing, and termination and restoration of service. A public hearing in the two proceedings was set for December 11, 1969, and any interested persons were invited to present "data, views or arguments"[4] orally or in writing. Notice was published in newspapers and sent to a list including the utility corporations of the classes mentioned in the proposals.

At the hearing appearances were entered for various companies including the petitioners, as well as for MLRI. The chairman of the Commission,[5] presiding, stated near the outset that these were rule making as distinguished from adjudicatory proceedings within the meaning of the Administrative Procedure Act. A number of public officials made statements; the speakers included members of the General Court, a Boston city councillor, the Commissioner of Administration of the Commonwealth, and representatives of the Consumer Protection Division of the Attorney General's office. Counsel for MLRI made an opening statement concerning its study and appraisal of the situation, and then presented testimony about the experiences of low income customers with the utility services. This came largely from attorneys in legal services offices knowledgeable in problems of the poor. Some of the testimony was illustrated by affidavits of the customers involved, and there was some direct testimony by customers. Also

[4] The quoted words were evidently taken from § 3 (1) of the Administrative Procedure Act (G. L. c. 30A, § 3 [1]), dealing like § 2 with adoption of regulations.

[5] Under G. L. c. 25, § 2, the department is under the supervision and control of a Commission of seven members. The hearing was attended by three Commissioners in addition to the chairman.

introduced were the written replies made by a few companies to a set of questions put to them by MLRI.

MLRI emphasized that utility services — especially gas and electric supply — are, as one witness put it, "essential to ordinary living," and that any inequities or ambiguities in the provision of such services would fall most heavily on the poor.

With respect to the companies' handling of customers' security deposits,[6] the proponents of regulation urged that the hardships imposed by capricious or arbitrary demands for these deposits should be eliminated by adoption of general rules with rational criteria.[7]

MLRI submitted that there was also a regrettable disuniformity and indefiniteness and more than occasional arbitrariness in the companies' handling of termination of service for customers' nonpayment of bills. Companies had shut off service on their own mistaken belief as to the facts, or in the face of honest protests by customers that they were not in arrears. (The Commissioner of Administration observed that "[t]he companies have a highly effective weapon to bring to bear in the event of disagreement. Faced with the threat of elimination of vital services such as electricity, gas or telephone service, even the hardiest customer frequently decides that it is easier to go along rather than to argue.") Certain billing practices were singled out as especially harsh. Thus a company might bill a customer on an estimated basis for a period of time, and then, after an actual reading of the meter, submit a very large bill adjusting for prior underestimates. The customer, caught unaware, might not be in a position to pay, yet he would be subject to discontinuance of service. So also a company might state in a series of bills showing amounts in arrears that it proposed to cut off

---

[6] The question of the rate of interest to be paid on the deposits was not developed beyond some mention by way of contrast of the rates paid by companies upon certain of their borrowings. (Statute 1969, c. 644, amending G. L. c. 158, § 16, had empowered the department to fix from time to time the rate payable on deposits.)

[7] See Note, 78 Yale L. J. 448.

service, but refrain from actually terminating, thus lulling the customer into the belief that he was being "carried"; then the company would suddenly make good the threat.

MLRI proposed a standardization of the period after billing and nonpayment before service could be discontinued, as well as correction of the injustice (as MLRI saw it) of having a company decide unilaterally that the customer was in fact delinquent when he was maintaining the contrary; there should be a final impartial arbiter, which might be the department itself. Related meter reading and billing practices should be reformed and better regularized.

During the hearing a question arose as to the affidavits received. The chairman said the Commission had procedural leeway; the companies could not insist upon exclusion of the affidavits in case the affiants were not produced for cross-examination, but the Commission would then take that factor into account in ascribing weight to the affidavits. Counsel who had produced the affidavits indicated they would do their best to produce the affiants at a later date.

A further hearing in D.P.U. 16386 and 16386A was scheduled for January 6, 1970, but it was not held. The Commission decided to sever and deal separately with the whole matter of security deposits. Accordingly, a proceeding D.P.U. 16696 was commenced on July 31, 1970, with due publication and notice, calling for a public hearing on August 25, 1970, on regulations proposed under § 2 of the Administrative Procedure Act applicable to gas, electric, and telephone companies on the subjects of billings, meter readings, estimated bills, termination of service, opportunities to contest termination of service, and use of multiple meters. This proceeding superseded D.P.U. 16386A and absorbed and carried forward the relevant parts of the record made at the December hearing.

The proposed regulations representing the target of the August hearing were a revision of the earlier draft

with security deposit provisions eliminated. The August hearing[8] was devoted almost entirely to oral statements on behalf of companies, supplemented by a number of written statements,[9] the whole elucidating company attitudes and practices and presenting criticisms of the proposed regulations, accompanied in some instances by suggested specific changes of the text.

Conceding the possibility of sporadic mistakes or injustices, the companies[10] nevertheless expressed confidence in the general fairness of the billing and termination procedures they had worked out for themselves. The procedures varied among the companies. Indeed it was suggested that differences in market and other conditions among the companies made a uniform procedure inadvisable; perhaps each company should submit its own procedure for separate approval by the department. As a rule the companies allowed about two months between billing and actual termination, which gave a realistic opportunity for protest by a customer who disputed the meter reading or the rate or his responsibility for the particular bill. The department evidently helped on occasion by informal mediation of disputes. But the companies were not prepared to give up their claimed right to discontinue service unilaterally and abruptly[11] if circumstances warranted. Regulations laying down a fixed minimum interval between billing and termination were therefore objected to, as was the idea of a moratorium on discontinuance of service pending resolution of disputes. The general tendency of such proposals, according to the companies, would be to delay payment of bills, slowing "cash flow" and ultimately increasing costs to the companies which in the long run would be borne disproportionately by cus-

---

[8] Two Commissioners were in attendance.

[9] A few written statements had been tendered just after the December hearing and are also made part of the record.

[10] Our digest of the hearing is composite and so does not fully describe some differences of outlook among the companies.

[11] See the reference under point D (1) below to G. L. c. 164, § 124.

tomers who paid their bills without cavil. Making the department the final arbiter of disputed bills would create an unmanageable problem for the department. There were a great many terminations,[12] and a large number could wind up as appeals to the department.

With respect to billing and meter reading procedures, the companies offered technical and other reasons why estimated billing should not and probably could not be eliminated. They commented also on the desirability and feasibility of the ultimate objective (foreshadowed in the proposals) of eliminating metering of a number of residence units en bloc and attaining universal metering of individual residence units.

When the companies had completed their oral statements at the August hearing, the question arose how to carry the proceeding to an end. It was suggested that there were no serious issues of fact on which further testimony would be helpful to the Commission when it came to decide the questions of policy posed by the regulations. After discussion there was apparent agreement that the companies might submit additional written statements which, so far as they made assertions of fact, would be taken as conceded unless they were put in question. Some written statements were submitted; no questions were raised.

B. *The regulations.* As the culmination of proceeding D.P.U. 16696, the department promulgated on December 9, 1970, to take effect December 16, 1970, a set of eight regulations, called "Regulations on Billing and Termination Procedures for Residential Customers of Gas and Electric Companies."[13] Only nonseasonal residential customers are affected; commercial accounts among

---

[12] Boston Gas Company (not a petitioner) estimated that it had 1,500 shutoffs for nonpayment a month in the first half of 1970.

[13] Telephone companies were not included. Counsel for these interests had argued before the department that the capacity of the telephone subscriber to run up a large bill in a very short time put telephone companies in a special situation with respect to discontinuance of servce.

others are untouched.[14]   The bills subject to the regulations are declared payable on receipt (i.e., three days after mailing) and collection efforts to obtain payments may be pursued immediately.   Service may be terminated, however, only if a bill or portion thereof remains unpaid more than forty-five days after receipt, and then only if the company, not less than thirty days after receipt of the bill, has given notice of its intention to terminate service on an indicated date not less than forty-eight days after receipt of the bill, and it remains unpaid on the indicated date.[15] Moreover, termination is prohibited for nonpayment of any disputed portion of a bill while a complaint, investigation, hearing, or appeal concerning it is pending under the regulations.[16]

A customer raises a complaint by notifying a representative of the  company, prior to termination, that a matter relating to a bill is disputed (for example, the amount of the bill or the proper party to be charged). The matter is then referred to a company designated "complaint officer" who makes an investigation and sends written notice to the customer of the disposition of the complaint.   The same notice advises the customer that, if disappointed in the result, he may appeal to the department within seven days of receipt of the notice.   If appeal is taken, a representative of the department notifies the company and conducts an investigation which includes an opportunity for each side in the dispute to be heard, but the hearing is not to be construed as an "adjudicatory proceeding" under the Administrative Procedure Act.[17]   The department may order service

---

[14] The companies had argued for this limitation.

[15] This is a somewhat simplified statement as to bills on a monthly basis. For companies with billing periods longer than forty-five days, the termination period may not be shorter than the billing period.

[16] But any undisputed remainder of a bill is unaffected and nonpayment thereof for a sufficient time may result in termination of service. This feature of the regulations was suggested by the companies.

[17] As to the latter statement, see point D (4) below.

terminated or continued on equitable terms; pending final determination it may issue temporary orders.[18]

Once a customer has raised a complaint, the company may terminate service only if the customer fails to make payment as follows: within seven days of an unfavorable decision of the company's complaint officer from which the customer does not appeal; within three days of receipt of an unfavorable decision of an appeal by the department; or within twenty-one days of the date of an appeal to the department if the department has not by that time issued a temporary order or made a final determination.[19]

Termination on grounds other than nonpayment of a bill may occur if the department certifies its approval after giving the parties an opportunity to be heard,[20] but provisions of the General Laws regulating and limiting terminations in the light of safety, health, and like factors are unaffected.

On billing procedure, the regulations state that if a company uses estimated bills it shall make an actual meter reading at least every other month and render a bill for the amount so determined that adjusts the account.[21]

Under the heading "multiple meters," there is a statement of future policy, namely, that the companies shall convert to a system whereby each residence unit in a multiple residence has a separate meter and is billed accordingly; the companies are to abandon the practice of having a single meter for the multiple residence and billing each residence unit therein on the basis of estimated allocations of the reading of that meter.[22]  Pend-

---

[18] A brief explanation of the procedure, starting with the customer's complaint, is to be set forth on each bill.

[19] This provision responds to the companies' insistence on preventing indefinite protraction of an appeal with corresponding suspension of the right of the company to shut off service.

[20] Also to be considered nonadjudicatory.

[21] There is provision for situations where the company is denied or cannot obtain access to the meter.

[22] This arrangement is to be distinguished from one where the whole use within a multiple residence is billed to the landlord, who makes

ing the change of practice, the bill to each residence unit in the multiple residence shall indicate what portion it represents of the total use for the building.

There is a general right on the part of a person aggrieved by company action in violation of the regulations to request an investigation by a complaint officer and subsequently to appeal to the department.

C. *Regularity of the departmental proceeding leading to issuance of the regulations.* The petitioners attack the regulations, first, as eventuating from a departmental proceeding conducted without proper procedural safeguards, and, second, as exceeding in their substance the department's powers and being otherwise invalid. In this point C we deal with the first objection.

(1) As our narrative shows, the department was proposing "regulations" and went on the assumption that the procedural "prerequisites" to their adoption were those laid down in § 2 of the Administrative Procedure Act. Those prerequisites — notice and public hearing[23] with opportunity for anyone interested to appear and contribute — were satisfied. The petitioners now argue that the situation called for an "adjudicatory proceeding" under §§ 10–11, in which various procedural incidents should have been accorded to them, notably a statement of the "issues" and of the "reasons" for the "decision" with "determination" of each issue of law or fact necessary to the decision and "substantial evidence" to support it. §§ 11 (1), (8), § 14 (8) (e).[24]

no separate charge for the service to the tenant – a "rent inclusive" arrangement. See *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 477, 481.

[23] Section 2 applies where a public hearing to consider a regulation is required "by any law," i.e., another statute; § 3 where it is not. Thus, technically, § 3 was applicable here; this would permit omission of a public hearing but still leave the requirements of notice and opportunity to be heard. See Sacks & Curran in 1954 Ann. Surv. Mass. Law, § 14.4, p. 131. It is unnecessary to distinguish between these sections for present purposes.

[24] This line of argument appears to have been first explicitly taken in requests for rulings of law filed by several petitioners after the second hearing.

Recognizing that a boundary between the concepts of "regulation" and "adjudication" has not been exactly placed despite formidable attempts at clarification,[25] we still think the present case falls well to the regulatory (or legislative or political) side. The Administrative Procedure Act defines "regulation" as every rule "of general application and future effect" which may be adopted by an agency "to implement or interpret the law" administered by it. § 1 (5). "[D]ecisions issued in adjudicatory proceedings" (§ 1 [5] [e]) contrast with "regulations," and an adjudicatory proceeding is described as one in which "the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." § 1 (1). What was at stake in the departmental proceeding in the present case was a set of rules for the future affecting the relations of two industries with an indeterminate public, rules that would fill out or complement a large statutory scheme administered by the department. The proceeding could not be fittingly described as intended simply to determine the particular legal interests of specifically identified persons.

The procedural consequences that follow upon the characterization of this proceeding as regulatory seem functionally appropriate to the kind of inquiry upon which the department was embarked. Cf. Davis, Administrative Law Treatise, §§ 5.02, 7.01. Presumably the department already had an understanding of the billing, termination, and related practices of the gas and electric companies and also an idea of the customer problems related to those practices. The department was in search of current information and arguments as to industry wide experience to supplement and test its

---

[25] See Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921; Bernstein, The NLRB's Adjudication – Rule Making Dilemma Under the Administrative Procedure Act, 79 Yale L. J. 571.

own knowledge and to help it shape a workable set of regulations if that was needed. Such contributions it elicited by its invitation to any interested persons under § 2. No purpose would have been served by importing formal litigious procedures. There were no disputes about specific facts concerning particular persons, their business or property, their motives, their relations to a given transaction [26] — so called "adjudicative facts" [27] — which needed untangling by trial methods. The introduction of case histories of disputes between individual customers and companies was not for the purpose of settling those quarrels but rather to domesticate or illustrate the general problems, and could not have the effect of transforming the regulatory endeavor into an adjudicatory one. See *Midwest Television, Inc.* v. *Federal Communications Commn.* 426 F. 2d 1222, 1226–1228 (D. C. Cir.).

This court has dealt on other occasions with the classification of agency proceedings as regulatory or adjudicatory and the matter need not be reëxamined here in detail. See *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 495–498; *Reid* v. *Acting Commr. of the Dept. of Community Affairs,* 362 Mass. 136, 138–145. Considering the cases cited by the petitioners themselves as examples, on the one hand, of regulatory or legislative activity,[28] and, on the other hand, of adjudication,[29] we think the present case is readily assimilated to the former group.

---

[26] See Bernstein, *supra,* fn. 25, at 610–615; Davis, *supra,* § 7.02.

[27] See *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 495–496; Davis, Administrative Law Treatise, § 7.02.

[28] *Hayeck* v. *Metropolitan Dist. Commn.* 335 Mass. 372, 373–375 (denial of access to land appropriated for public use). *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617 (determination that banking facilities in a town were inadequate). The *Reid* case, *supra,* at 142–143 (hearings on urban renewal plan).

[29] *Newton* v. *Department of Pub. Util.* 339 Mass. 535 (hearing on petition of railroad to discontinue service on a particular line). *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716 (hearing on petitions of three water companies to increase their rate schedules). *New York Cent. R.R.* v. *Department of Pub. Util.* 347 Mass. 586 (hearing on railroad's petition for exemption of certain

(2) Any constitutional claim to a trial type hearing fails if the proceeding was indeed regulatory or legislative or political. The question is not to be decided by a mechanical process of categorization; rather we rely on the considerations of functional suitability already mentioned. *Hayeck* v. *Metropolitan Dist. Commn., supra,* at 375. *Natick Trust Co.* v. *Board of Bank Incorporation, supra,* at 617. *Reid* v. *Acting Commr. of the Dept. of Community Affairs, supra,* at 140. *Bi-Metallic Inv. Co.* v. *State Bd. of Equalization of Colorado,* 239 U. S. 441, 445–446. *United States* v. *Storer Bdcst. Co.* 351 U. S. 192, 200–206. The constitutional claim is not enhanced by saying that the petitioners' "legal rights, duties or privileges" were materially affected by the hearings in the sense that the regulations may increase their operating costs and alter their conditions of service. A regulation, like legislation, often increases costs or diminishes business expectations or even proprietary rights, but neither demands a prior confrontation resembling a lawsuit because an inquiry so tightly controlled is not a necessary basis for the governmental judgment involved. In the *Bi-Metallic* case, for example, the valuation of taxable property was increased; in the *Hayeck* and *Reid* cases land had been or was expected to be taken by eminent domain. The petitioners rely on *Massachusetts Medical Serv.* v. *Commissioner of Ins.* 344 Mass. 335, 339–340, and *Massachusetts Gen. Hosp.* v. *Commissioner of Admn.* 353 Mass. 369, 374–375, cases involving administrative rate settings which can be read as requiring quasi judicial hearings as a matter of constitutional right; but the administrative decisions turned necessarily on analysis of specific figures justifying the rates to be paid, in the one case by Blue Shield for services of participating physicians, and, in the other case, by various State and municipal agencies to the several hospitals for treatment of public patients.

---

land from local zoning law). *New York Cent. R.R.* v. *Department of Pub. Works,* 354 Mass. 332 (hearing on petition of railroad to set up a grade crossing).

(3) The petitioners say that the departmental proceeding was so conducted as to render it adjudicatory, but the demonstration is hollow.

The petitioners suggest that because they (among others) were given mailed notice of the hearings, they became "specifically named persons" within § 1 (1). It is enough to say that the notice came about through the "list notice" system provided by the statute (§§ 2 [1], 3 [1]) under which anyone who wishes may place his name on an agency list for the year and thereby receive notice by mail of regulatory hearings likely to affect him. The system was intended simply to supplement newspaper notice as a means of alerting interested persons. See Sacks & Curran in 1954 Ann. Surv. Mass. Law, § 14.4, pp. 131–132.

Peppered into the petitioners' argument is the further suggestion that when the Commission indicated it would allow the companies to cross-examine those who had sworn affidavits, and would give diminished weight to this evidence if the affiants were not produced for cross-examination, it necessarily stamped the proceeding as adjudicatory. Surely a regulatory proceeding does not lose its character when more procedural rights are accorded, or more orderly methods are employed, than may be customary in the conduct of such a proceeding. For a recent statement of that proposition, see *United States* v. *Florida East Coast Ry.* 410 U. S. 224, 236, n. 6. It may be observed that while the petitioners seem aggrieved by the fact that the affidavits stood without cross-examination, they did not continue to press actively for an opportunity to cross-examine. On a reading of the whole record it rather appears that the petitioners themselves finally recognized the inconsequence of cross-examining particular customers in hearings to consider the desirability of industry wide regulation;[30] in

---

[30] To the petitioners' suggestion that evidence by affidavit was incompetent, it suffices to answer that such proof has been considered acceptable even in an adjudicatory proceeding. See *AAA Movers* v.

the end the petitioners seemed content simply to submit oral and written statements of fact and position. They did not offer to submit more, yet they complain of the thinness of the data on which the department acted. This is to argue as if MLRI or the department had to sustain a burden of proof as does a proponent in an ordinary action.

(4) The question is raised whether the department was not required to make a formal demonstration that the regulations as promulgated were within the department's statutory authority to adopt regulations. See G. L. c. 164, § 76C (department to establish rules and regulations). More particularly, § 11 (8) of the Administrative Procedure Act is cited as requiring an agency "decision" to be accompanied by "a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." Section 11 (8) is linked to § 14 (8) which governs judicial review of agency decisions and obliges the court to overturn a decision that is not supported by substantial evidence.

These two sections apply to decisions reached in adjudicatory proceedings, not regulations promulgated after regulatory proceedings. *Westland Housing Corp.* v. *Commissioner of Ins.* 352 Mass. 374, 380–381. *Berman* v. *Board of Registration in Medicine,* 355 Mass. 358, 360. *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.* 359 Mass. 652, 654–655. *Department of Pub. Health* v. *Cumberland Cattle Co.* 361 Mass. 817, 828. Yet again, more is involved here than word chopping. With respect to quasi judicial decisions involving particular persons, it is appropriate that court review should search the factual and legal basis of the agency action to see that justice was done, and this is helped by the agency's furnishing an explanatory statement which the court can examine and criticise. No such

*Department of Pub. Util.* 354 Mass. 390, 392–394, and § 11 (2) of the Administrative Procedure Act.

process is needed, nor would it usually be desirable, with respect to general rules prescribed by an agency to govern future conduct, for here judicial review is quite limited (see point D [2], [3] below); for the court to check back on the agency's "reasons" and "determination[s]" of fact and law would have an unhealthy tendency to substitute the court for the agency as policymaker. Our cases delineate the differences just discussed. Compare *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 718, and *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination,* 361 Mass. 352, 354–355, with *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617, and *First Natl. Bank* v. *Board of Bank Incorporation,* 361 Mass. 381, 383. See *Electronics Corp. of Am.* v. *City Council of Cambridge,* 348 Mass. 563, 568.

There may be proceedings, say the petitioners, otherwise properly called regulatory and culminating in regulations, where the agency nevertheless should be required to give a statement of its reasons with subsidiary determinations. They cite *Penn Cent. Co.* v. *Department of Pub. Util.* 356 Mass. 478. The department had issued regulations requiring certain safety appliances to be installed on railroad passenger cars operating in Massachusetts. The railroads contended that the department had entered on a prohibited field, that certain Congressional enactments must be read as intended to exclude such attempted regulation by a State, and that the Constitution itself forbade the State regulation because it would put a substantial and unlawful burden on interstate commerce, disturbing national uniformity where that was especially important. The court thought the field had not been preëmpted by Federal statutes or regulations; nevertheless, said the court, the regulations at bar "lie in a doubtful and sensitive area, where unfortunate conflicts between State and Federal interests may arise. An administrative body operating in this area will do well (even in a regulatory proceeding under

G. L. c. 30A, §§ 2, 3, which is not subject to those provisions of c. 30A governing adjudicatory proceedings) to develop a record containing substantial evidence, and preferably definite D.P.U. findings supported by that evidence, which establishes the validity of the regulations under applicable constitutional or statutory [meaning State statutory] provisions." (At 485.) The court went on to say that "[a]pplicable constitutional considerations in this area call . . . for D.P.U. determinations" (at 486) that the regulations did not conflict with Federal enactments or unlawfully burden interstate commerce and that, complying with the State statutory authority under which the regulations were issued (chiefly G. L. c. 159, § 16), they were reasonably necessary or appropriate (at 486). The court of course granted that the question of necessity for railroad regulations was for the department, but said that the evidence before the department supporting the regulations was "fragmentary, speculative, and unconvincing" (at 486) and that a better showing should be made. The department was directed to reconsider and expand its record.

Because the regulations were at the knife-edge of constitutionality and because the Federal-State context was a peculiarly sensitive one, the court seemed prepared to ask more of the department than the Administrative Procedure Act on its face required, to request the department to furnish a particularly strong foundation for its action, which might then lend support to an ultimate decision by the court. The *Penn Cent.* case can apply only to extraordinary situations, otherwise it offends established law expounded in such cases as *Natick Trust Co.* and *First Natl. Bank,* cited above. The petitioners say that, just as there was a possible Federal-State conflict in the *Penn Cent.* case, so there is a legislative-executive conflict in the present case, since they are challenging the substantive power of the department to issue these regulations and are claiming that full-blown legislation is required. To analogize the two situations is to inflate a routine inquiry about the statutory authority of the

department into the dimensions of a constitutional crisis.

(5) In transmitting the regulations to the Secretary of the Commonwealth pursuant to G. L. c. 30, § 37, the chairman of the Commission wrote that they had been "adopted by vote of the Commission"; there is also record of a D.P.U. certificate from the Secretary of the Commission to this court certifying "a true copy of the actual vote of the Commission . . .," consisting of a copy of the regulations stamped "Approved" and signed· by the chairman and five other Commissioners. The petitioners question whether the foregoing shows compliance with § 11A of the Administrative Procedure Act requiring agencies to "maintain accurate records of their meetings, setting forth the action taken at each meeting." See *First Natl. Bank* v. *Board of Bank Incorporation,* 361 Mass. 381, 383–384. This question of form can be met by the Commission's making an accurate record of the vote taken to approve the regulations.

D. *Validity of the regulations.* An attack is made on the substance of the regulations, but the petitioners can ask from the court at this time an opinion only as to the apparent or surface validity of the regulations, for they have not yet been put to practical use. Practice may show up particular features of the regulations in a new light and in that event we shall not be foreclosed from reconsidering the views here expressed.

The basic authority for the regulations is G. L. c. 164, § 76C, inserted by St. 1969, c. 645, which states: "The department may establish from time to time such reasonable rules and regulations consistent with this chapter as may be necessary to carry out the administration thereof."

(1) The petitioners first question whether the regulations relate to "administration" in the sense of § 76C and whether they are "consistent" with c. 164. At times the petitioners seem to seek to confine the department's powers under § 76C to regulation of the internal procedures of the department having only inconsequential

external effects of a substantive character. On its face, however, § 76C is a broad grant of regulatory power enabling the department to further the purposes of c. 164, a lengthy chapter dealing in a comprehensive way with the organization and operations of gas and electric companies.

Section 76C was recommended to the Legislature by the department itself which desired "specific authorization in . . . [c.] 164 to make regulations thereunder," see 1969 House Doc. No. 175, par. 12, and the departmental proceedings leading to the present regulations were instituted shortly after the coming into effect of § 76C. We have hitherto read § 76C as giving the department "broad power to establish rules and regulations consistent wtih c. 164." *Boston Edison Co.* v. *Sudbury*, 356 Mass. 406, 418, n. 10 (proposed rules affecting safety of transmission lines, a matter not explicitly treated in c. 164, cited as a possible subject for § 76C rule making). We should reject a cramped reading of the section and rather consider it to extend to the interpretation and elaboration of the panoply of powers and duties confided to the department by c. 164. This includes § 76 of c. 164 providing that the department "shall have the general supervision of all gas and electric companies," to which end it shall "keep itself informed as to the condition of the respective properties owned by such corporations and the manner in which they are conducted with reference to the safety and convenience of the public."[31] But a regulation under § 76C need not necessarily find support in a particular section of c. 164; it is enough if it carries out the scheme or design of the chapter and is thus consistent with it. See *United States* v. *Storer Bdcst. Co.* 351 U. S. 192, 195,

---

[31] Also to be mentioned here is G. L. c. 164, § 94, regarding rates, interpreted in *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 477, 484–485, as giving the department power over "rate practices" as well as "rate scales," and not only over "rates, prices and charges for various classifications of service, and the relationship between classifications," but also "reasonably related terms and conditions stated in the service contract or the filed schedules."

201–203; *Federal Power Commn.* v. *Texaco,* 377 U. S. 33, 39–42. See also Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921, 972. Cf. *Commonwealth* v. *Diaz,* 326 Mass. 525, 527–528.

The petitioners assert that the regulations collide with particular sections of c. 164, but we do not agree; indeed, we find the more important sections cited to be supportive of the regulations. Thus § 92 states that when a gas or electric company refuses or neglects to supply a person with service, he may petition the department which, upon notice to the company to appear and show cause why relief should not be granted, may order the company to supply service upon legal and reasonable terms.[32]   There is no literal or functional inconsistency between § 92 and the present regulations; rather the regulations should be read as aiding the section by establishing a procedure that anticipates the company's actual refusal of service for nonpayment of a bill. In fact it appears that the department in the light of § 92 has in some instances heard the parties when refusal of service was threatened but not yet carried out. See Petition of Augustine J. Randolph, D.P.U. No. 15932 (1968); Note 67 Harv. L. Rev. 845, 849.

Sections 124 and 124A–124C deal in a general way with termination of service. Section 124 states that, if the three later sections are inapplicable,[33] a company "may stop gas or electricity from entering the premises of any person failing to pay the amount due therefor" and for that purpose utility employees may enter the

---

[32] *Wyatt* v. *Boston Consol. Gas Co.* 319 Mass. 251, held that a party seeking to compel a company to reëstablish service after a voluntary discontinuance must apply to the department under § 92 and could not sue the company direct.

[33] Sections 124A–124C. prohibit termination: at any home where there is serious illness; at certain medical institutions, unless fourteen days' notice is given to the department as well as to the customer, and then only on conditions determined by the department; or because the customer has failed to pay for an appliance furnished by the company. The present regulations leave these sections unaffected.

premises "after three days' notice by mail." Section 124 does no more than describe a company's remedy (and some limitations on its exercise) when a customer fails to make a payment that is legally required. It does not purport to determine when payment is so required. The present regulations help in this regard, adopting as a working principle for the future the view, which, as we note below, has common law acceptance, that an unpaid portion of a utility bill under dispute is not "due" in the sense that the company is privileged to make it the basis for shutting off service. The distinction taken in the regulations between when a bill is payable and when it is due is not inconsistent with statute, nor is common usage offended by the interpretation adopted.[34]

Some eleven sections of c. 164 are cited which have to do with meters, meter reading, and billing of customers.[35] These statutes exemplify the legislative purpose to make meter readings and billings understandable and fair; they do not conflict with or exclude the present regulations seeking to achieve similar ends.

(2) According to § 76C the regulations are to be "reasonable" and "necessary." The court's function is to see that the line of arbitrariness is not crossed. See *Commonwealth* v. *Diaz*, 326 Mass. 525, 530; Cooper, State Administrative Law, 257–262, and authorities cited. Compare the discussions in *Environmental Defense Fund, Inc.* v. *Ruckelshaus*, 439 F. 2d 584, 596–598 (D. C. Cir.); *Chicago* v. *Federal Power Commn.* 458 F. 2d 731, 741–744 (D. C. Cir.); Davis, Administrative Law Treatise, § 30.10. We think the line has not been

---

[34] General Laws c. 164, § 94D, permitting discounts for prompt payment, supports the distinction by implicitly recognizing that billing dates, discount dates, and default dates may be separate points in time.

[35] G. L. c. 164, §§ 115, 115A, 116, 117–119, 119A, 120–123. The petitioners' related argument that the regulations constitute an undue intrusion into the management of the utilities is untenable; this court has allowed the department to intervene in business affairs of utilities in a much more significant way than it would be doing under these regulations. See, e.g., *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 90.

passed here — at least as we appraise the regulations on their face, before they are put into operation. Gas and electric service is vital to consumers. Disputes over billings and terminations are endemic. The regulations are in part a recognition and reduction to legal rule for the future of going practices of the companies, which in fact generally refrain from shutting off service for a considerable period after billing. Nor is it an arbitrary exercise of power for the department to ban the companies from cutting off service for nonpayment of portions of bills about which there is an unresolved dispute. This position conforms to a large body of case law holding that the customer is entitled to have service continued by the utility company pending resolution of a bona fide dispute, a right enforceable by injunction if need be. The cases evidently recognize and deprecate the self-serving, unilateral, coercive power that the utility would otherwise have. See, e.g., *Schultz* v. *Lakeport*, 5 Cal. 2d 377, 382; *Steele* v. *Clinton Elec. Light & Power Co.* 123 Conn. 180, 184–185; *Barry* v. *Commonwealth Edison Co.* 374 Ill. 473, 477, and authorities cited; *Wood* v. *Auburn*, 87 Maine 287, 292– 293; *Hall* v. *Swanton*, 113 Vt. 424, 427–428; annotation, 112 A. L. R. 237; Note, 62 Col. L. Rev. 312. See also *Turner* v. *Revere Water Co.* 171 Mass. 329, 336–337 (the court affirmed a Superior Court decree restraining the water company from refusing to supply the plaintiff with water; he had tendered payment of his own bill, but declined to pay the bill of a former occupier of the same premises). Further, we cannot say that the department was arbitrary in concluding that it should interpose itself as impartial umpire, acting under fair procedures, in disputes between customers and companies. Recent decisions have indeed suggested that vital utility service on reasonable and nondiscriminatory terms is an "entitlement" under State law guarded by the due process clause, and that termination of this necessity by a publicly regulated company, holding a publicly granted local monopoly, is tantamout to official action to which procedural guaran-

ties of notice and hearing attach. *Ihrke* v. *Northern States Power Co.* 459 F. 2d 566 (8th Cir.), judgment vacated sub nom. *Northern States Power Co.* v. *Ihrke,* 409 U. S. 815. *Palmer* v. *Columbia Gas Co. of Ohio, Inc.* 342 F. Supp. 241 (N. D., Ohio). *Stanford* v. *Gas Serv. Co.* 346 F. Supp. 717 (D. Kans.). *Bronson* v. *Consolidated Edison Co. of N. Y. Inc.* 350 F. Supp. 443 (S. D. N. Y.). Contra, *Lucas* v. *Wisconsin Elec. Power Co.* 466 F. 2d 638 (7th Cir.) (two judges dissenting), cert. den. 409 U. S. 1114. These cases stem from recent Supreme Court decisions imposing due process requirements upon the State's cancelling an individual's access to a service or benefit which the State has extended to the public, even a. service or benefit which it might initially have withheld. *Goldberg* v. *Kelly,* 397 U. S. 254. *Bell* v. *Burson,* 402 U. S. 535. See *Sniadach* v. *Family Fin. Corp. of Bay View,* 395 U. S. 337; *Fuentes* v. *Shevin,* 407 U. S. 67. Finally, as to the directives of the regulations on the details of meter reading and billing (in large part organically connected with the termination problem), we can hardly declare them to be capricious as against the judgment of the agency which has long supervised these industries. See *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615, 617; *Penn Cent. Co.* v. *Department of Pub. Util.* 356 Mass. 478, 487.

Of course the present regulations cannot be held arbitrary merely because it might have been reasonable for the department to agree with the companies and the status quo, or to frame regulations in a quite different way.

(3) The petitioners complain that the regulations will result in "confiscation" of their "property." This translates into a prediction that the regulations will have the effect of decelerating cash flow from customers, of increasing the number of customer accounts that must be written off, and of adding otherwise to expense. But the forecast is a speculative and unqualified one; against it are to be set the beneficial objects of the regu-

lations as the department might see them.   If the pre-
dicted results are realized at all, one would expect them
to be reflected on the books of the several companies
in different ways and to different degrees.   The dollars
and cents figures would then enter into the calculations
which are presented at rate making proceedings and
become the basis for rate adjustments.   The regulations
cannot be condemned beforehand as confiscatory.   See
*Bowker* v. *Worcester,* 334 Mass. 422, 434; *Electronics
Corp. of Am.* v. *City Council of Cambridge,* 348 Mass.
563, 567–568.

(4) Under the regulations a customer within seven
days of receipt of the complaint officer's adverse decision
may notify the department that he wishes to appeal,
whereupon "a representative of the Department shall
notify the company and thereafter shall conduct an
investigation.   Such investigation shall include an op-
portunity for each side in the dispute to be heard, but
such hearing shall not be construed to be an 'adjudicatory
proceeding' as defined by . . . [the Administrative Pro-
cedure Act].   Pending final determination of the appeal
by the Department, the Department may enter any
temporary orders to the company or to the customer
which it deems just and equitable."

As originally drafted, the regulations provided ex-
pressly that the agency representative, called a hearing
officer, was to conduct an adjudicatory proceeding.   This
characterization was withdrawn in the second draft
considered at the August hearing.   As adopted, the reg-
ulations contain the negative statement.   The reason for
the turnabout evidently was that the companies had
continually stressed the burden that would be cast on the
department by customer appeals; counsel for one of
the companies suggested that the burden would be re-
duced if the procedure was made summary.

The petitioners now insist that the department must
provide an adjudicatory proceeding with the procedural
incidents of §§ 10–11 of the Administrative Procedure

Act, while the interveners indicate they are willing to accept something less which will, however, afford the essentials of a fair hearing.

Turning once more to § 1 (1) of the act defining an adjudicatory proceeding, we surely have at stake, in the dispute between company and customer, "the legal rights, duties or privileges of specifically named persons." This legal relationship is an important one, and if it is "determined" by the agency in a practical sense, then opportunity for an agency hearing is required by constitutional right (even if not required by separate statute), and §§ 1 (1) and 10–11 define the kind of hearing to be then afforded. See *Milligan* v. *Board of Registration in Pharmacy*, 348 Mass. 491, 499–500. Cf. *Goldberg* v. *Kelly*, 397 U. S. 254, 263–266. It is intimated in the interveners' brief that the departmental representative will not be making a determination, or at any rate a firm determination, because his decision will be fully reviewable by a court at the behest of the disappointed party, the limitations on scope of judicial review laid down in § 14 being inapplicable because the decision would not have eventuated from an adjudicatory proceeding. This line of reasoning is questionable because it might open the way for an agency to circumvent the requirement of an adjudicatory proceeding whenever it was willing to pay the price of full, rather than restricted, judicial review of its action. But more fundamentally, the agency decision here should be considered as in reality final, because in the great bulk of cases resort to the courts is not practical, surely not for the customer, and almost as certainly not for the company.

We conclude that the safeguards of an adjudicatory proceeding must be afforded,[36] but it is for the department to say at what stage that shall be done. The

[36] We have traced this to "constitutional right," but G. L. c. 164, § 92 (see point D [1] above) might well be held a "provision of the General Laws" requiring agency hearing when demanded by the customer in the face of an actual or threatened discontinuance of service.

regulations themselves do not exclude the interpretation that a party, disappointed by the result of the investigation-plus-hearing conducted by the departmental representative, and desiring to persist beyond that decision, may claim an adjudicatory proceeding under §§ 10–11 which may undo the representative's decision. A two step arrangement is not uncommon in administrative agencies, particularly those which have to process numerous claims, and it is indeed envisaged by § 10 (second par.) of our act, providing that in such a situation the requirements for an adjudicatory proceeding need be met only at the second stage. Cf. *Rowan* v. *United States Post Office Dept.* 397 U. S. 728, 738–739. Few appeals, one imagines, would here survive action by the complaint officer and decision by the departmental representative and wind up as adjudicatory proceedings. Protraction to that point seems especially unlikely when one considers the tendency of such matters, where the issues are, after all, few and relatively simple, to be disposed of by threshold informal mediation.[37] In all events, the department should make clear in the regulations that an adjudicatory proceeding will be available.

It might have been convenient if the Administrative Procedure Act permitted an agency, in proceedings of the adjudicatory type, to improvise fair procedures, geared to the requirements of particular classes of cases and not necessarily including all the elements of §§ 10–11, cf. Jaffe & Nathanson, Administrative Law (2d ed.) 862–866, but we doubt that the act can be read that way. Within the latitudes of §§ 10–11, however, the department can, we think, progressively shape procedures to fit the peculiar needs of these appeals.[38]

[37] See Davis, Administrative Law Treatise, § 4.11, citing the Report of the Attorney General's Committee on Administrative Procedure (1941). Section 10 (first par.) of our act encourages this informality by the provision that agencies may "make informal dispositions of any adjudicatory proceeding by stipulation, agreed settlement, consent order or default."

[38] What has been said in this point D (4) applies also to appeals to the department under the regulations unrelated to the issue of termination of service for nonpayment of bills.

E. *Mode of judicial review of the legality of the regulations.* The parties ask guidance as to the proper form of judicial review of regulations such as those in question. There is no difficulty with the declaratory case, for § 7 of the Administrative Procedure Act states that "[u]nless an exclusive mode of review is provided by law" judicial review of a "regulation" may be had by means of a proceeding for declaratory relief under G. L. c. 231A, § 2, which extends the declaratory suit to tests of the validity of administrative regulations. As already shown, we have here "regulations," and, whatever may be said of appeal under G. L. c. 25, § 5 (discussed immediately below), we do not think it qualifies as the exclusive method of reviewing them.

The further question is whether G. L. c. 25, § 5, may be optionally used for the review of a regulation. This statute presents some difficulties of interpretation, because it antedated[39] the Administrative Procedure Act which introduced the basic distinction between regulatory and adjudicatory proceedings. We think it should now be read as inapplicable to regulations and designed to provide judicial review of departmental actions resulting from proceedings of the adjudicatory or similar type. The words "any final decision, order or ruling of the commission," as they appear in the first paragraph of § 5, may possibly be thought broad enough to cover "regulations," but the sense of the section, with its references to requests to the Commission for rulings on questions of substantive law,[40] appeal by "an aggrieved party in interest," specifications of errors of law in the claim of appeal, and findings as to the facts, is that it does not extend to the review of regulations, but rather of litigious determinations. On this view § 5 meshes with the Administrative Procedure Act which states in § 14 that "where a statutory form of judicial

---

[39] Section 5 was originally enacted in 1906 and has been amended five times since.

[40] Requests for rulings were made by some of the petitioners here, see n. 24, *supra*, but the Commission left them unanswered.

review or appeal is provided" with respect to an agency decision in an adjudicatory proceeding, that statutory form shall govern, but the standards for review shall (with an exception) be those set forth in § 14 (8).

There are many cases in which appeal in accordance with G. L. c. 25, § 5, has in fact been used for the review of decisions in adjudicatory proceedings; often the court in those cases has made cross-references to sections of the Administrative Procedure Act dealing with such proceedings.[41] It is noteworthy that after the enactment of the Administrative Procedure Act, the provisions of c. 25, § 5, as to preparation of the record for review were amended to conform to the cognate provisions §§ 11 and 14 of the act on review of decisions in adjudicatory proceedings. Commentators incline toward the view here taken.[42] In the case of *Penn Cent.* v. *Department of Pub. Util.* 356 Mass. 478, this court reviewed under c. 25, § 5, actions of the department that were evidently considered in the nature of regulations, but the method of review was not discussed. The parties may have been led to § 5 because the regulations in question were issued under a statute calling in terms for an "order" by the Commission.

It may be thought unfortunate that choice of the statutory form of review should turn on a typing or classification of the agency action involved which may itself involve analytic difficulties. On occasion, indeed, classification for purposes of seeking judicial review may turn out not exactly congruent with the classification for other purposes. In cases of doubt the party may protect himself, as did some of the petitioners here, by preparing his case in both forms. In the present case

---

[41] See, e.g., *New York Cent. R.R.* v. *Department of Pub. Util.* 347 Mass. 586, 592–593; *Almeida Bus Lines, Inc.* v. *Department of Pub. Util.* 348 Mass. 331, 341–342; *Westborough* v. *Department of Pub. Util.* 358 Mass. 716, 717–718.

[42] See Curran in 1956 Ann. Surv. Mass. Law, § 13.4, p. 128; Gadsby in 1954 Ann. Surv. Mass. Law, § 17.8, p. 183; Segal, Administrative Procedure in Massachusetts; Rule Making and Judicial Review, 33 B. U. L. Rev. 1, 25–26.

we shall treat the appeals under c. 25, § 5, as if they were suits for declaratory relief.

F. *The interventions.* The single justice allowed a motion by MLRI and MWRO to intervene in the consolidated case. These organizations as interveners expressed their opposition to a stay of the effectiveness of the regulations and have also argued in support of the regulations. The petitioners say that the department, through the Attorney General, adequately represented the public interest, and it was improper to allow an intervention by others presumably for the same purpose. Intervention by an outsider in a cause to which the government is a party may be of dubious value where it has the effect of diminishing the government's control of the litigation: so, for example, in the famous *El Paso* antitrust litigation,[43] where parties, once admitted as interveners, were assumed to have a right to prevent a voluntary settlement by a consent decree acceptable to the United States.[44] No such question arises in the present case where, as the petitioners apparently agree, the intervention amounts to no more than an opportunity to argue as an amicus. We think the single justice had wide discretion in dealing with interventions, see *American Woolen Co.* v. *Old Colony Trust Co.* 263 Mass. 321, 325, and it seems particularly fitting that MLRI, for itself and MWRO, was permitted to speak, for MLRI had originally framed the regulations in suit.

G. *Disposition.* Subject to action by the department to make clear in the regulations that an adjudicatory proceeding is available (see point D [4] above), and subject, further, to compliance with the formality of § 11A of the Administrative Procedure Act (see point C [5] above), the regulations will be declared generally

---

[43] See *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.* 386 U. S. 129.

[44] As to the possibility of limiting or conditioning interventions, see Wright & Miller, Federal Practice and Procedure, § 1922; Shapiro, Some Thoughts on Intervention before Courts, Agencies, and Arbitrators, 81 Harv. L. Rev. 721, 752–756.

valid in the sense of this opinion (see point D, first paragraph, above). The stay heretofore granted by the single justice will be vacated.

*So ordered.*