HARBORVIEW RESIDENTS' COMMITTEE, INC. *vs.* QUINCY
HOUSING AUTHORITY
(and a companion case[1]).

Suffolk.    May 7, 1975. — July 30, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Housing.   Jurisdiction, Civil,* Housing, Declaratory relief.   *Regula-
tion.   Statute,* Construction.

Under G. L. c. 121B, § 29, the Department of Community Affairs
    had the power to require local housing authorities to adopt a lease
    and grievance procedure with respect to tenants which satisfied the
    "minimum requirements" of model lease and grievance regulations
    promulgated by the department.   [426-430]
Regulations of the Department of Community Affairs requiring hous-
    ing authorities to provide conferences and hearing to defaulting
    tenants and a continuation of leases until a proper termination
    thereof were not invalid as in conflict with the provision of G. L.
    c. 121B, § 32, *as amended* by St. 1971, c. 1114, § 1, that housing
    authorities should operate dwelling accommodations "at the lowest
    possible cost" [430-431]; nor were the department's regulations in-
    valid in that they provided for administrative conferences, hearings,
    and appeals in situations in which such proceedings were not man-
    dated by G. L. c. 121B, § 32 [433].

Two CIVIL ACTIONS commenced in the Supreme Judicial
Court for the county of Suffolk on September 24, 1974,
and October 29, 1974, respectively.

The cases were reserved and reported by *Braucher,* J.

[1] Commissioner of the Department of Community Affairs *vs.* Quincy
Housing Authority.   Housing authorities are bodies politic and corpo-
rate which can sue or be sued in their own names.   G. L. c. 121B,
§§ 3, 11 (*a*), inserted by St. 1969, c. 751, § 1.   The office of Com-
missioner of Community Affairs was abolished, and its functions
turned over to the office of the Secretary of Communities and De-
velopment by St. 1975, c. 163, § 1.   A motion should be filed in the
county court to amend the description of the parties accordingly.

*Danielle E. deBenedictis,* Assistant Attorney General, for the Secretary of Communities and Development.

*Terence J. McLarney (Richard C. Allen* with him) for Harborview Residents' Committee, Inc.

*Nathaniel M. Sherman* for Quincy Housing Authority.

*Roger Witkin,* for Revere Housing Authority, amicus curiae, submitted a brief.

QUIRICO, J.   On September 24, 1974, the plaintiff Harborview Residents' Committee, Inc. (tenants), filed a complaint in this court for Suffolk County seeking injunctive and declaratory relief under G. L. c. 214, § 1, and G. L. c. 231A, §§ 2, 6, against the defendant Quincy Housing Authority (QHA).   The tenants' complaint alleged, inter alia, that QHA had failed to comply with lawful regulations of the Department of Community Affairs (DCA) regarding procedures to be followed when QHA sought to evict a tenant from the governmentally subsidized housing operated and maintained by QHA in Quincy.   On October 9, 1974, after hearing, a single justice issued a preliminary injunction restraining QHA from acting in violation of the DCA regulations in question.   On October 29, the Commissioner of DCA as a plaintiff filed a separate complaint against QHA seeking essentially the same relief sought by the tenants in their complaint.   On November 6, a stipulation that the two cases would be consolidated was filed and allowed by a single justice.   On December 18, an "Agreed Statement of Facts and Stipulation of Issues" was filed.   On January 27, 1975, a single justice reserved and reported the proceedings to the full court on the complaints, various exhibits, the preliminary injunction, QHA's answer, various stipulations, a letter, and the agreed statement of facts.

The dispute in these cases centers around the validity of certain related portions of two sets of regulations promulgated by DCA on February 22, 1973.   One set of these regulations is entitled "Regulations Prescribing Lease Provisions for Public Housing" (Lease Regulations),

while the other is entitled "Regulations Relating to Tenant Grievance Procedures" (Grievance Regulations). The Lease Regulations contain a "Model Dwelling Lease for Public Housing in Massachusetts" (Model Lease), and the Grievance Regulations contain a "Model Grievance Procedure." The Lease Regulations and Grievance Regulations require each local housing authority (LHA) either to adopt the Model Lease and Model Grievance Procedure or implement an alternative lease and grievance procedure which meet the "minimum requirements" of the model instruments unless the DCA grants a waiver of one or more of its minimum requirements. Both sets of regulations provide that a waiver is to be granted only on a showing of one of the following: (a) the requirement is inappropriate or inapplicable because of peculiar local conditions; (b) the requirement will impose a substantial hardship on the LHA or on the tenant; or (c) the LHA and the tenants mutually agree that a requirement is undesirable in light of a particular local circumstance.

Subsequent to the filing of the original complaint in these cases, QHA adopted and agreed to implement a lease as prayed for in that complaint, that is, a lease in accordance with the Lease Regulations and the Grievance Regulations, except that the lease adopted does not comply with § VI (C) of the Model Lease and § A of the Model Grievance Procedure.[2] QHA had requested a waiver of these provisions and DCA had refused to grant the waiver. It is not contended that these provisions have any particular impact on QHA or its tenants as distinguished from any other LHA or its tenants, and of course the tenants have not agreed that the provisions are

---

[2] While we have repeated above the general language of the "Agreed Statement of Facts and Stipulation of Issues" to the effect "that the lease adopted does not comply with the . . . Grievance . . . Regulations," it would seem that more precise language would state that the lease adopted did not comply with the Model Lease and that, therefore, any grievance procedures adopted could not comply with the Model Grievance Procedure.

undesirable. In other words, the sole issue before us is whether it was within the power of DCA to require the adoption of a lease and grievance procedure which satisfy the minimum requirements of § VI (C) of the Model Lease and § A of the Model Grievance Procedure, with particular reference to administrative procedures to be followed before resort to judicial proceedings for eviction of a tenant.

Section VI (C) of the Model Lease prohibits an LHA from terminating a lease unless: (1) the LHA management has a "private conference" with the tenant and presents the tenant with a written statement containing specific information, including the reasons for the termination and the tenant's right to request a hearing, within ten days after the conference, under the Model Grievance Procedure; (2) the LHA management gives the tenant, after this conference, a written "Notice to Vacate" specifying a termination date not less than thirty days after the notice is given (this notice cannot be given until either ten days have passed after the conference within which time the tenant has not requested a hearing or, if a hearing has been requested, after the release of the hearing panel's written decision upholding the termination); and (3) the tenant has not paid his back rent prior to eviction. Sections A-F of the Model Grievance Procedure provide in essence that in certain circumstances, including where the LHA fails to act in accordance with the lease, an aggrieved tenant may (1) receive a hearing before a "hearing panel"; (2) appeal an adverse hearing panel decision to the LHA board; and (3) appeal an adverse LHA board decision to DCA. Section A (2) provides: "The LHA shall take no administrative or court action against any Tenant involving any matter before the Hearing Panel, the LHA Board or . . . DCA . . . until a final decision has been reached on the matter." In short, the Lease Regulations and the Grievance Regulations prevent an LHA from instituting an action of summary process, G. L. c. 239, § 1A, inserted by St. 1973,

c. 778, § 3, until after the administrative sequence of conference, hearing, and appeal has run its course.

In *Commissioner of the Dept. of Community Affairs* v. *Medford Housing Authy.* 363 Mass. 826 (1973), we ruled that DCA had the authority to promulgate five sets of regulations, including the Lease Regulations and the Grievance Regulations here at issue, and that the regulations were generally valid. *Id.* at 835. While we reserved decision on the validity of specific provisions of some of the regulations, including those now at issue, *id.* at 832-833, we rejected the defendant LHA's argument that DCA did not have the power to make rules for the internal operation of local housing projects. *Id.* at 829-830. On this point we said: "General Laws c. 121B, § 29, authorizes 'regulations prescribing standards and stating principles governing the . . . maintenance and operation of . . . housing projects by housing authorities.' The authority so granted is ample to cover large matters and small, procedural and substantive, internal and external. Any type of decision which is open to LHAs is also open to supervision by DCA." *Id.* at 830, citing *West Broadway Task Force, Inc.* v. *Commissioner of the Dept. of Community Affairs*, 363 Mass. 745, 747-748 (1973).

In *Cambridge Elec. Light Co.* v. *Department of Pub. Util.* 363 Mass. 474 (1973), we considered whether the Department of Public Utilities (DPU) had authority under G. L. c. 164, § 76C, inserted by St. 1969, c. 645, to promulgate rules and regulations which, among other matters, prohibited utility companies from terminating their service to nonseasonal residential customers for nonpayment of a bill "while a complaint, investigation, hearing, or appeal concerning it is pending under the regulations." *Id.* at 482-483. The regulations provided for a scheme of notice, hearing, and appeal prior to termination of service generally similar to the scheme established by the DCA regulations involved in these cases. Our holding in that case regarding the DPU's authority to

establish the challenged regulations is particularly perti-
nent here because of the fact that the grant of the power
to DCA to make regulations in its area of superintend-
ence, G. L. c. 23B, § 6, inserted by St. 1969, c. 761,
§ 1, and G. L. c. 121B, § 29, inserted by St. 1969,
c. 751, § 1, is similar to the grant of the power to the
DPU to make regulations in its area of superintendence,
G. L. c. 164, § 76C. We upheld the DPU regulations,
and in the course of our opinion said: "The court's
function is to see that the line of arbitrariness is not
crossed. . . . We think the line has not been passed here
— at least as we appraise the regulations on their face,
before they are put into operation. Gas and electric
service is vital to consumers. Disputes over billings and
terminations are endemic. . . . [It is not] an arbitrary
exercise of power for the department to ban the
companies from cutting off service for nonpayment of
portions of bills about which there is an unresolved dis-
pute. . . . Further, we cannot say that the depart-
ment was arbitrary in concluding that it should interpose
itself as impartial umpire, acting under fair procedures,
in disputes between customers and companies." *Id.* at
496-497.

In light of the cases discussed above, it would seem
plain that DCA had the power to promulgate regula-
tions regarding procedures to be followed by LHAs
seeking to terminate tenants' leases. QHA, however,
apparently argues that the regulations are in conflict with
two provisions of G. L. c. 121B, § 32.

General Laws c. 121B, § 32, as appearing in St. 1971,
c. 1114, § 1, provides in part: "It is hereby declared to
be the policy of this commonwealth that each housing
authority shall manage and operate decent, safe and
sanitary dwelling accommodations *at the lowest possible
cost*" (emphasis supplied). QHA seems to assert that the
regulations in question are contrary to this statutory
language because the regulations could cause an LHA to
expend funds in providing conferences and hearings,

while losing funds through the forced continuation of the leases of defaulting tenants. This contention runs squarely in the face of the following excerpt from the *Medford Housing Authy.* case, 363 Mass. at 833 (1973): "We . . . hold . . . that the fact that a regulation has the effect of requiring an expenditure of funds does not establish a violation of the policy that 'each housing authority shall manage and operate decent, safe and sanitary dwelling accommodations at the lowest possible cost.' G. L. c. 121B, § 32." We reaffirm that holding here.

Finally, QHA argues that the regulations are in violation of the following provision of § 32: "The tenancy of a tenant of a housing authority shall not be terminated without cause and without reasons therefor given to said tenant in writing. A tenant at his request shall, except in the case of nonpayment of rent, be granted a hearing by a housing authority at least fifteen days prior to any such termination. The housing authority's determination of cause shall be reviewable in the district court whenever an action of summary process is brought for possession of the premises." QHA's argument here seems to be that by requiring more than the statutorily prescribed minimum in the way of administrative procedures prior to lease termination, DCA acted in conflict with the legislative will. In particular, QHA points to the fact that the statute requires that a tenant be granted a pre-termination hearing "except in the case of nonpayment of rent," and argues that this language represents a *limit* on the procedures which can be established by DCA. We read this provision of the statute, however, as setting a *floor* under the procedures which can be established, and believe that the Legislature intended to permit DCA to augment those procedures where necessary to protect the interest of tenants and LHAs.

The situation here is similar to that involved in *Cambridge Elec. Light Co.* v. *Department of Pub. Util.* 363 Mass. 474 (1973), discussed above. In that case we upheld DPU regulations regarding procedures to be

followed in utility service terminations even though a number of statutory provisions dealt with that subject. *Id.* at 493-496. We are, of course, aware of the maxim of statutory construction which suggests that a statutory expression of one thing is an implied exclusion of other things omitted from the statute. See, for example, *Universal Mach. Co.* v. *Alcoholic Beverages Control Commn.* 301 Mass. 40, 45 (1938); *Iannelle* v. *Fire Commr. of Boston,* 331 Mass. 250, 252-253 (1954). However, we have also recognized that the maxim is not to be followed where to do so would frustrate the general beneficial purposes of the legislation. *Simmons* v. *County of Suffolk,* 230 Mass. 236, 237-238 (1918). Sands, Sutherland Statutory Construction, § 47.25 (4th ed. 1973). Moreover, we note that the regulations here in question were promulgated by DCA in response to 1970 House Doc. No. 5000, which had specifically urged DCA to act to remedy various problems in subsidized housing projects. *Id.* at 12-13. Among the problems recommended for attention were the lack of standardized procedures, *id.* at 12, the use of punitive lease provisions, *id.* at 14, the failure of LHAs to inform tenants of their rights, *id.* at 13-14, and abuses by LHAs of eviction procedures, *id.* at 24. 1970 House Doc. No. 5000 was issued by the Legislature's Joint Committee on Urban Affairs Subcommittee on Housing. While the legislative intent in passing G. L. c. 121B, § 32, cannot be constructed ex post facto, we nevertheless attach some significance to substantially contemporaneous statements or actions of concerned legislators. See *Johnson's Case,* 318 Mass. 741, 746-747 (1945). Moreover, it is a matter of note that the Legislature may, by its inaction following DCA's issuance of these regulations in response to the 1970 report, be deemed to have acquiesced in DCA's construction of § 32 as nonexclusive. *Lynch* v. *Commissioner of Educ.* 317 Mass. 73, 80-83 (1944). Sands, Sutherland Statutory Construction, § 49.10 (4th ed. 1973). In summary, we hold that the regulations here at

issue do not conflict with § 32 by reason of their providing for administrative conferences, hearings, and appeals in situations where these proceedings are not mandated by the statute.

A judgment is to be entered in the county court that the regulations at issue are valid and binding on QHA. Injunctive relief is to be denied because we assume that the declaratory judgment will be sufficient to accomplish QHA's compliance with the regulations. The preliminary injunction issued by the single justice will terminate on entry of the declaratory judgment.

*So ordered.*