Burnes, J.
INTRODUCTION
Plaintiff Linda Fennelly (“Fennelly”) filed this action against the defendant landlords seeking declaratoiy and injunctive relief and monetary damages for excluding her and her children from their Section 8 subsidized apartment following a fire. This matter is before the court on the parties’ cross-motions for summary judgment on Counts I through V of the complaint pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the defendants’ motion for summary judgment is DENIED and the plaintiffs cross motion is ALLOWED.
BACKGROUND
The undisputed facts, and any disputed facts viewed in the light most favorable to the nonmoving party, as revealed by the summary judgment record are as follows. Defendant Kimball Court Apartments Limited Partnership (“Kimball”) owns a four-building apartment complex, containing 351 residential rental units, located at 2, 3, 5 and 6 Kimball Court and known as the Kimball Court Apartments in Woburn, Massachusetts. (Agreed Facts ¶1.) Defendant JRM Management Company (“JRM”) is the managing agent for Kimball. (Agreed Facts ¶3.)
Kimball leased a parcel of land to Kimball Court Apartments HI Limited Partnership up on which it built the buildings at 5 Kimball Court and 6 Kimball Court. (Agreed Facts ¶2.) Kimball Court Apartments III is subject to a mortgage from, and rent and occupancy restrictions imposed by, the Massachusetts Housing Finance Agency (“MHFA”). (Agreed Facts ¶9.) Kimball Court Apartments III Limited Partnership receives federal low income housing tax credits as part of its financing with MHFA. (Agreed Facts 111 1.) The rents and occupancy of approximately 42 of the 167 apartments at 5 and 6 Kimball Court are restricted by provisions of Section 42 of the Internal Revenue Code, 26 U.S.C. §42. (Agreed Facts ¶12.) In addition, Kimball Court Apartments III Limited Partnership received a loan from the Massachusetts Executive Office of Communities and Development under the State Housing Assistance for Rental Production (“SHARP") program which also imposes rent and occupancy restrictions on Kimball Court Apartments. (Agreed Facts ¶10.)
On December 1, 1990, Fennelly and her two minor sons moved into a two bedroom apartment, Apt. G14, at 6 Kimball Court (“the Unit”) as tenants under a state rental assistance program. (Fennelly Aff. ¶1; Agreed Facts ¶5.) Kimball Court Apartments III Limited Partnership designated the Unit as one of its tax credit, low income units. (Agreed Facts ¶13.) In March of 1997, Fennelly received a Section 8 voucher[2] issued by the Woburn Housing Authority (“WHA”), and on April 1, 1997, she and JRM executed a Section 8 voucher lease for the Unit (“the Lease”) and a HUD-required Lease Addendum (“the Addendum”). (Kutny Aff. ¶¶3, 4; Joint Ex. B; Zorzonello Aff. ¶4.) The Lease provides that it is for a term of one year unless earlier terminated pursuant to its terms and, thereafter, shall automatically extend from month to month under the same terms unless terminated by thirty days prior written notice by either party. (Joint Ex. A.) Paragraph K of the Lease provides that “(i]f the premises are rendered uninhabitable by fire, flood or other natural disaster during the term of this agreement, this agreement is thereupon terminated.” (Joint Ex. A.)
Paragraph E of the Lease provides:
The attached Lease Addendum (Form HUD 52647.3) which is annexed hereto is hereby incorporated herein and made a part thereof. In case of any conflict between the starred * provisions of the Lease or the attached Lease Addendum (Form HUD 52647.3) and any other provisions of the Lease, the provisions of said starred provisions and attached Lease Addendum shall prevail.
Paragraph O of the Lease further provides:
The attached Lease Addendum (Form HUD 52647.3) which is annexed hereto is hereby incorporated herein and made a part hereof. If there is any conflict between any of the provisions of this Lease and the provisions contained in said Lease Addendum, the provisions of the Lease Addendum (Form HUD 52647.3) shall prevail and take precedence over any other such provisions.
(Joint Ex. A.)
*39 Paragraph 7 of the Addendum provides that the Lease terminates if “The owner terminates the tenancy; The tenant terminates the lease; or The owner and the tenant agree to terminate the lease.” (Joint Ex. B.) Paragraph 10 of the Addendum provides:
The owner may only terminate the tenancy on the following grounds:
Serious or repeated violation of the terms and conditions of the lease;
Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the contract unit and the premises;
Criminal activity (as provided in paragraph b); or
Other good cause.
(Joint Ex. B.) Paragraph 10 of the Addendum further provides that “[tjhe owner may only evict the tenant from the contract unit by instituting a court action.” (Joint Ex. B.) Paragraph 18 of the Addendum provides that “[i]f there is any conflict between the provisions of the lease addendum and any other provisions of this lease, the lease language required by HUD shall control.” (Joint Ex. B.)
Finally, Fennelly and JRM executed an Occupancy Agreement, under which JRM leased the Unit to Fennelly for a period of one year, beginning April 1, 1997. (Joint Ex. Commonwealth.) The Occupancy Agreement provides that “unless terminated as hereinafter provided, this lease shall be renewed for successive terms of 12 months each at the end of the initial term.” (Joint Ex. Commonwealth.) Paragraph H, Section 2 of the Occupancy Agreement provides:
If the whole or any substantial part of the leased premises shall during the term of this lease or any extension thereof be destroyed by fire or other disaster not caused by Resident or Resident’s invitees, family or agent, then:
a. If Management or Resident chooses, this Agreement shall terminate by notice to the other party; or
b. If Management does not terminate this Agreement, then a just portion of the rent as determined by MHFA shall be abated until the premises are restored and suitable for occupancy.
Notices of termination under this Section shall cause this Agreement to terminate on the last day of the month in which the notice was given.
(Joint Ex. Commonwealth.)
On April 1, 1997, WHA executed a HAP contract with JRM. (Kutny Aff. ¶4.) The total HUD fair market rent for the Unit was $904 per month, including heat and hot water. Fennelly was responsible for paying $344 toward this rent and WHA paid the balance. (Agreed Facts ¶15.)
John Zorzonello (“Zorzonello”) is an employee of JRM whose responsibilities include renting apartments, executing leases, maintenance, and responding to tenant complaints and requests. (Zorzonello Aff. ¶¶1, 2.) Beginning in April of 1997, Zorzonello received numerous complaints from other tenants that Fennelly’s children were unsupervised, playing in the parking lot, hallway, and other inappropriate areas. (Zorzonello Aff. ¶4.) Zorzonello communicated with Fennelly both verbally and in writing asking her to supervise her children and abide by the terms of her lease. (Zorzonello Aff. ¶4.) In July of 1998, Zorzonello instructed JRM’s attorneys to initiate eviction proceedings against Fennelly for failing to properly supervise her children, who had caused property damage in the common areas and created a dangerous situation by playing in the parking lot. (Zorzonello Aff. ¶5.) The eviction case was settled by the filing of a stipulation in which Fennelly agreed to take steps to ensure that the members of her household would not disturb the peace and quiet of the other residents. (Zorzonello Aff. ¶5.)
On May 30, 2000, there was a fire in the Unit which rendered it uninhabitable and caused damage to the common area and surrounding apartments. (Zorzonello Aff. ¶6; Fennelly Dep. p. 25.) Since the fire, Fennelly and her sons have been temporarily staying with family elsewhere in Woburn. (Agreed Facts ¶17.) Fennelly was not home when the fire started, as she was scheduled that afternoon for emergency surgery for a detached retina at the Massachusetts Eye and Ear Infirmaiy in Boston. (Fennelly Aff. ¶4.) Fennelly’s two sons were in the Unit with some friends when the fire began in the boys’ bedroom. (Zorzonello Aff. ¶6.) The smoke detectors and fire alarm in the Unit did not sound, so one of Fennelly’s sons called “911.” (Fennelly Aff. ¶5.) Prior to the fire, JRM had not received a written request from Fennelly to make any repairs to the smoke alarm in the Unit. (Zorzonello Aff. ¶7.) Fennelly had, however, informed the management office in 1999 and earlier in the year 2000 that the smoke detector was not working. (Fennelly Aff. ¶5.) The smoke alarm in the Unit was hard wired and can only be dismantled by physically unplugging the power source to the alarm. (Zorzonello Aff. ¶7.) The smoke alarm cover in no way affects the operation of the alarm. (Zorzonello Aff. ¶7.) The smoke alarm in the Unit does not notify the Fire Department, although there is a heat detector in the Unit which will notify the Fire Department if triggered. (Zorzonello Aff. ¶7.)
JRM’s insurance company, Fireman’s Fund Insurance, investigated the fire in the Unit and issued a report concluding that the fire originated in the lower bunk bed in the boys’ bedroom by an outside ignition source such as matches or cigarettes. (Def. Ex. A.) The report concluded that the fire did not originate from an electrical source such as faulty wiring in the Unit, a lamp, or a consumer electronic device. (Def. Ex. A.) *40 Fennelly’s sons deny starting the fire. (Fennelly Aff. 113.)
Because the Unit was uninhabitable and dangerous after the fire, JRM changed the locks on the Unit for safety and security reasons. (Zorzonello Aff. 111.) Several days after the fire, Fennelly called Zorzonello to arrange a time to remove any salvageable belongings from the Unit. (Zorzonello Aff. 111.) Zorzonello told Fennelly that she would have to sign a release before the demolition workers could enter and begin work on the Unit. (Fennelly Dep. p. 124.) Zorzonello explained that the purpose of the document was to release the contents of the apartment so that the Unit could be gutted. (Fennelly Dep. p. 129.) Fennelly agreed to sign the release if Zorzonello would hold for her some items which she had not yet been able to retrieve, including a Stairmaster and a vacuum. (Fennelly Dep. p. 124, 129.) Zorzonello agreed, and on June 5, 2000, Fennelly executed a release (“the Release”) discharging JRM, its agents, officers, directors, employees, attorneys and assigns from all liability in law and equity “on account of the fire that occurred in the unit at 6 Kimball Court #14 Woburn, MA on or about May 30, 2000 at Kimball Court Apartments.” (Zorzonello Dep. p. 129; Def. Ex. B.) Fennelly executed the Release in front of Zorzonello and her sister, Debbie Fennelly. (Fennelly Dep. p. 134.) At the time she executed the Release, Fennelly was on Percocet for pain in her eye, which had been operated on several days earlier. (Fennelly Dep. p. 200.) She was wearing a patch over the injured eye, did not have her glasses, and did not read the Release prior to signing it. (Fennelly Dep. pp. 128, 200-01.) After Fennelly removed everything she wanted and the Unit was secured, demolition workers began gutting it. (Zorzonello Aff. 111.) Fennelly told Zorzonello several times that she wanted to return to the Unit after it was habitable, but he stated that it was not his decision. (Fennelly Aff. ¶7.)
After the fire destroyed the Unit, Zorzonello informed WHA that pursuant to paragraph K of the Lease, the agreement between Fennelly and JRM terminated and the HAP contract also terminated. (Zorzonello Aff. ¶12.) JRM has not received any rental payments for the Unit from either Fennelly or WHA since the fire. (Zorzonello Aff. ¶12; Kutny Aff. ¶5.) In order for Fennelly to return to the Unit, she would have to possess a valid Section 8 voucher and request lease approval from WHA, WHA would have to inspect the Unit, and a new Section 8 voucher lease and HAP contract would have to be executed. (Kutny Aff. ¶6.)
By letter dated June 8, JRM notified Fennelly that it was terminating her tenancy pursuant to paragraph H(2)(a) of the Occupancy Agreement. (Def. Ex. Commonwealth.) The letter stated that the tenancy was also terminated pursuant to paragraph K of the Section 8 Voucher Lease because the premises had been rendered uninhabitable by fire. (Def. Ex. Commonwealth.) After receiving this letter, Fennelly spoke to Fran Coulter (“Coulter”) at the WHA, who informed her that, unfortunately, the lease was terminated by the fire. (Fennelly Dep. p. 26.) When Fennelly asked whether she would be able to get another lease for the Unit, Coulter responded that it was up to JRM and suggested that Fennelly look for other apartments because it might take a while to restore the Unit. (Fennelly Dep. p. 27.) Fennelly diligently looked for other housing but has not been able to find a Section 8 apartment for under $1,000 per month. (Fennelly Aff. ¶10.) She filled out an application for an apartment located near her mother’s house that was $1,000 per month without utilities, but in the middle of July, she was informed that the apartment had been rented to someone else. (Fennelly Dep. p. 31.)
After vacating the Unit, Fennelly received two checks in the mail from JRM totaling $953.61, which represented the return of her rental payment for June of 2000 and her security deposit on the Unit. (Second Fennelly Aff. ¶2.) Fennelly endorsed these checks and deposited them in her bank account. (Second Fennelly Aff. ¶2.)
Thereafter, on October 25, 2000, Fennelly filed the present complaint alleging a breach of the Lease in Count I; violation of federal law governing Section 8 housing in Count II; violation of G.L.c. 186, §14 in Count III; violation of G.L.c. 186, §15F in Count IV; violation of G.L.c. 184, §18 in Count V; breach of the implied warranty of habitability in Count VI; and negligence in Count VII. On November 7, 2000, this Court (Neel, J.) issued a Memorandum of Order on the Plaintiffs Application for a Preliminary Injunction denying Fennelly’s request for an order allowing her to immediately re-occupy the Unit, but restraining the defendants from leasing the Unit to any third party. JRM eventually repaired the Unit to habitable condition and the Woburn Fire Department issued a certificate of occupancy for the Unit on November 13, 2000. (Agreed Facts ¶¶18, 19.) On November 30, 2000, Kimball and JRM filed a counterclaim against Fennelly alleging breach of the Lease in Count I and negligence in Count II.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56 (commonwealth). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expec *41 tation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The parties have cross-moved for judgment as a matter of law on Count I of the complaint, which alleges that Kimball and JRM have breached the Lease by terminating Fennelly’s tenancy following the fire. Interpretation of an unambiguous written contract is a question of law appropriate for disposition upon summary judgment. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995); Lo Cicero v. Hartford Ins. Group, 25 Mass.App.Ct. 339, 341 (1988). It is well established that an unambiguous contract must be enforced according to its terms. Schwanbeck v. Federal Mogul Corp., 412 Mass. 1, 5 (1992); Curtis v. Surrette, 49 Mass.App.Ct. 99, 103 (2000). Kimball and JRM contend that under the clear language of Paragraph K of the Lease and Paragraph H, Section 2 of the Occupancy Agreement, Fennelly’s lease automatically terminated when the May 30, 2000 fire rendered the Unit uninhabitable. The parties may provide for the termination of a lease upon the happening of a particular event. See Loitherstein v. International Business Machines Corp., 11 Mass.App.Ct. 91, 93 (1980), rev. den., 383 Mass. 890 (1981). Fennelly argues that the destruction of premises clause relied on by the defendants is trumped by the HUD-required language in Paragraph 10 of the Addendum, which provides that a tenant’s Section 8 lease can only be terminated by initiating a court action, and only for violation of the Lease, violation of state or federal law governing tenant obligations, criminal activity or other good cause.
Both the Lease and Addendum clearly state that if there is any conflict between their respective provisions, the provisions of the Addendum, which contain the lease language required by HUD, control. Kimball and JRM argue that Paragraph K of the Lease does not conflict with Paragraph 10 of the Addendum because they set forth the rights and obligations of the parties under entirely different circumstances: Paragraph K provides for the automatic termination of a Section 8 tenancy based on the occurrence of a specific event, a fire rendering the premises uninhabitable, while Paragraph 10 of the Addendum provides procedures for the landlord to terminate a Section 8 tenancy when the premises is habitable and the tenant is still in possession.
An interpretation which gives reasonable meaning to all provisions of a contract is preferred to one which renders a provision superfluous. Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986); Associated Credit Services, Inc. v. City of Worcester, 33 Mass.App.Ct. 92, 94, rev. den., 413 Mass. 1107 (1992). Nonetheless, this Court concludes that Paragraph K conflicts with Paragraph 10 of the Addendum. The purpose of Paragraph 10 is to protect the Section 8 tenant’s right to continued occupancy in a particular premises against arbitrary and unfair action by the landlord, in light of the shortage of affordable housing for low-income families. To that end, Paragraph 10 of the Addendum provides that the only way the owner may terminate a Section 8 tenancy is to institute a court action and prove good cause to terminate. Paragraph K, however, allows the owner to terminate the tenancy following a fire, without good cause and without a summary process action, simply by invoking its terms. To the extent that JRM and Kimball invoked Paragraph K to terminate the lease, Paragraph K conflicts with the terms of Paragraph 10 of the Addendum, which expressly states that the only way a landlord can terminate the Section 8 tenancy is by instituting a court action and demonstrating good cause to terminate.
In accordance with the express language of Paragraphs E and O of the Lease and Paragraph 18 of the Addendum, Paragraph K must yield to Paragraph 10 of the Addendum. The termination provisions in Paragraph 10 are required by HUD in connection with the Section 8 program. See 42 U.S.C. §1437f(d)(B)(iv); 42 U.S.C. §1437d(o)(7) (Commonwealth); 42 U.S.C. §1437d(o)(7)(E); 24 C.F.R. §982.308(f)(2); 24 C.F.R. §982.310. These provisions, as incorporated into the Addendum, have the force of federal law, and cannot be overridden by private contract. See Thorpe v. Housing Authority of Durham, 89 S.Ct. 518, 522-23 (1969). Compare Harborview Residents Committee, Inc. v. Quincy Housing Authority, 368 Mass. 425, 428-30 (recognizing the Department of Community Affairs’ power to require local housing authorities to adopt a model lease containing grievance procedures for tenants and restrictions on landlord’s ability to terminate the lease). See also Reynolds Bros., Inc. v. Commonwealth, 412 Mass. 1, 5 (1992) (stating that where there is a conflict between a statutorily required contract provision and the remainder of the expressed contract, the required provision controls). The protections against termination in Paragraph 10 of the Addendum trump the fire termination provision in Paragraph K of the Lease. See Corcoran Management Co., Inc. v. Ghazal, Northeast Housing Court No. 00-SP-00344 (March 31, 2000) (Kerman, J.) (concluding that following a fire, notwithstanding a destruction of premises clause, the landlord could not terminate a Section 8 tenancy without following the HUD-required procedures contained in the lease).
Further, the facts of the present case demand such a result. The Unit which was temporarily rendered uninhabitable by a fire has now been restored and is ready for occupancy by a tenant, yet Kimball and JRM have changed the locks on the Unit and refuse to allow Fennelly to resume her Section 8 tenancy.[3] These circumstances suggest the type of arbitrary and unfair landlord action against which the HUD-required language in the Addendum was designed to protect low-income tenants. To the extent that Kimball and JRM *42 may have good cause for denying Fennelly continued occupancy of the Unit based on the suggestion in the record that Fennelly’s failure to properly supervise her sons caused the ñre, they must comply with the procedural requirements of Section 10 of the Addendum and institute the appropriate summary process proceedings. Fennelly’s Section 8 lease, tenancy and right to occupy the Unit were not automatically terminated by the May 30, 2000 fire. Fennelly is entitled to judgment as a matter of law on Count I of the complaint.
The parties further cross-move for summary judgment on Count II of the complaint, which alleges that the termination of Fennelly’s lease without good cause and without initiating a summary process action violated the provisions of federal law relating to Section 8 housing and deprived her of the due process of law. It is well established that the Fourteenth Amendment is implicated only by state action. Bello v. South Shore Hospital, 384 Mass. 770, 773 (1981). Thus, the eviction of a tenant from a public housing project implicates due process protections. See Spence v. Gormley, 387 Mass. 258, 266-76 (1982). The conduct of a private actor such as Kimball is subject to the Fourteenth Amendment only if the relationship between the state and the actor is symbiotic in character and the state has so far insinuated itself into a position of interdependence that it must be recognized as a joint participant in the challenged activiiy. See Phillips v. Youth Development Program, Inc., 390 Mass. 652, 656 (1983) (concluding that a Youth Development Program was not a state actor even though it was entirely state funded and was created to serve the Juvenile Court as its sole client, where the state had no control over the Program’s personnel decisions); Bello v. South Shore Hospital 384 Mass. at 774-76 (concluding that a hospital was not a state actor even though it was licensed and regulated by the state and received state and federal funding).
Other courts have concluded that the eviction of a Section 8 tenant from private housing constitutes state action for purposes of the Fourteenth Amendment because there is a substantial continuing government involvement in a Section 8 tenancy: the government pays a major portion of each month’s rent to the landlord and has a direct contractual relationship with the landlord for the tenant’s benefit, and the landlord submits to significant regulation, including government imposed restrictions on the terms of the tenancy and in particular, the grounds for termination. See Swann v. Gastonia Housing Authority, 675 F.2d 1342, 1346 (4th Cir. 1982). In the present case, in addition to the general Section 8 requirements, tenancy of the Unit was governed by the Low Income Housing Tax Program, which itself requires that termination of the tenancy be for good cause, and rent and occupancy restrictions imposed by the MHFA and SHARP. See 26 U.S.C. §§42(h)(6)(B)(i) and 42(E)(ii)(I); Joint Exhibits D and E. “Here the landlords are, in return for an assured consideration, and subject to specific and continuing oversight, helping the state realize its specific prioriiy objective of providing . . . good quality housing at rents which can be afforded by those of low and moderate income.” McQueen v. Druker, 438 F.2d 781, 784 (1st Cir. 1971). Although the mere receipt of financial subsidy and subjection to some regulation are insufficient to confer the status of state actor, “when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches.” Id. at 784-85 (finding state action in a landlord’s eviction of a tenant where the landlord purchased the property from the city redevelopment authority and was required by agreement to adhere to many standards, including limitations on rental duration, amounts and increases, admission policies, management and transfer of title). This Court concludes that the relationship between the government and Kimball and JRM with respect to the Unit is symbiotic in character and interdependent enough so that the defendants’ conduct in terminating Fennelly’s tenancy constituted state action.
In analyzing a claim of due process, the court must first determine whether the plaintiff has a constitutionally protected property right by analyzing the nature of the interest at stake and if it finds a protected right, must then determine what process is due, taking into account competing interests. Take Five Vending, Ltd. v. Provincetown, 415 Mass. 741, 747 (1993); Lotto v. Commonwealth, 369 Mass. 775, 777 (1976). As noted by other courts, because a tenant in the Section 8 housing program is assured by statute that she will continue in occupancy in the absence of good cause for eviction, a Section 8 tenancy is a properly interest protected by the due process clause. See Swann v. Gastonia Housing Authority, 675 F.2d at 1346; Jeffries v. Georgia Residential Finance Authority, 678 F.2d 919, 925 (11th Cir.), cert. den., 459 U.S. 971 (1982). This Court thus concludes that Fennelly has a constitutionally protected properly interest in her tenancy of the Unit. Nonetheless, this Court need not engage in a lengthy analysis of what process is due Fennelly before the defendants can deprive her of her tenancy, because federal law, as expressed in the HUD-required language in the Addendum, establishes the minimum protections that are due when a landlord seeks to terminate a Section 8 tenancy, and it is undisputed that Fennelly was not afforded such protections in this case. Kimball and JRM’s conduct in declaring the Lease terminated and excluding Fennelly from the Unit following its restoration to habitability, without good cause and without commencing a summary process action, violated due pro *43 cess. Accordingly, Fennelly is entitled to judgment as a matter of law on Count II of the complaint.
Count III of the complaint alleges that Kimball and JRM interfered with Fennelly’s quiet enjoyment of the Unit in violation of G.L.c. 186, §14, which provides in relevant part:
any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant. . . shall be liable for actual and consequential damages or three month’s rent, whichever is greater, and the costs of the action, including a reasonable attorneys fee, all of which may be applied in setoff to or in recoupment against any claim for rent owed or owing. The superior and district courts shall have jurisdiction in equity to restrain violations of this section.
The covenant of quiet enjoyment is a promise that, during the term of the tenancy, the tenant will not be disturbed in the enjoyment of the premises by the lessor or anyone claiming under him or claiming paramount title. Rahman v. Federal Management Co., 23 Mass.App.Ct. 701, 704, rev. den., 400 Mass. 1102 (1987). The covenant is violated by an act which amounts to a serious interference with the tenancy and which substantially impairs the character and value of the leased premises. Leardi v. Brown, 394 Mass. 151, 167 (1985); Rahman v. Federal Management Co., 23 Mass.App.Ct. at 705.
Clearly, Kimball and JRM’s conduct in declaring the Lease terminated and refusing to allow Fennelly to return to the Unit after it was restored to habitability on November 13, 2000 constitutes a serious interference with her tenancy and substantially impairs the value of the premises. See Curnoyer v. Davis, 1977 Mass.App.Div. 1032, 1041-42 (concluding that a landlord violated the covenant of quiet enjoyment where he locked the tenant out of her apartment). Compare Rahman v. Federal Management Co., 23 Mass.App.Ct. at 705-06 (concluding that the mere filing of a summary process action does not violate the covenant of quiet enjoyment). Even assuming that Kimball and JRM were acting under a good faith misunderstanding of the law, a landlord may be liable -under G.L.c. 186, §14 where although he acted in good faith, his negligence deprived the tenant of the quiet enjoyment of the premises. Cruz Management Co. v. Thomas, 417 Mass. 782, 789 (1994). For purposes of the statute, it is the landlord’s conduct and not his intention which is controlling. Id.; Lowery v. Robinson, 13 Mass.App.Ct. 982, 982-83 (1982). Thus, the defendants’ conduct in declaring the Lease terminated and refusing to allow Fennelly to return to the Unit after it was restored to habitability violated G.L.c. 186, §14.
Count IV of the complaint alleges that Kimball and JRM excluded Fennelly from the Unit in violation of G.L.c. 186, §15F, which provides in relevant part:
If a tenant is removed from the premises or excluded therefrom by the landlord or his agent except pursuant to a valid court order, the tenant may recover possession or terminate the rental agreement and, in either case, recover three months’ rent or three times the damages sustained by him, and the cost of suit, including reasonable attorneys fees.
This statute is remedial and is to be liberally construed to effectuate its purpose. Serreze v. YMCA of Western Mass., Inc., 30 Mass.App.Ct. 639, 643 n.9 (1991). Kimball and JRM’s conduct in declaring the Lease terminated and refusing to allow Fennelly to return to the Unit after it was restored to habitability violates G.L.c. 186, §15F. Thus, Fennelly is entitled to partial summary judgment, on liability only, with respect to Counts III and IV of the complaint. This Court notes that any damages ultimately awarded to her under Counts III and IV must not be duplicative.
Finally, Count V of the complaint alleges that Kim-ball and JRM violated G.L.c. 184, §18, which provides in relevant part:
No person shall attempt to recover possession of land or tenements in any manner other than through an action brought pursuant to chapter two hundred and thirty-nine or such other proceedings authorized by law. The superior and district courts shall have jurisdiction in equity to enforce the provisions of this Section.
The defendants’ conduct in improperly excluding Fennelly from the Unit since its restoration to habitability on November 13, 2000 constitutes a violation of G.L.c. 184, §18. See Curnoyer v. Davis, 1977 Mass.App.Div. at 1041 (concluding that a landlord’s conduct in locking a tenant out of her unit violated c. 184, §18). Compare Serreze v. YMCA of Western Mass., Inc., 30 Mass.App.Ct. at 640 n.4. Accordingly, Fennelly is entitled to judgment as a matter of law on Count V of the complaint.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment on Counts I through V of the complaint be DENIED and that the plaintiffs cross-motion for summary judgment on Counts I through V be ALLOWED.
It is hereby DECLARED and ADJUDGED that Paragraph K of the Lease conflicts without Paragraph 10 of the Addendum. Therefore, the May 30, 2000 fire in the Unit did not automatically terminate Fennelly’s tenancy under the Lease and the Section 8 program.[4]

 Under the Section 8 housing program, the Housing and Urban Development Agency (“HUD") authorizes local authorities to issue federally funded vouchers to eligible low income families pursuant to 42 U.S.C. §143 7f(b). (Kutny Aff. ¶2.) A Section 8 voucher allows a tenant to have the housing authority pay a portion of the rent directly to the landlord pursuant to a Housing Assistance Payment (“HAP") contract between the authority and the landlord. (Kutny Aff. ¶2.)

 KimbaU and JRM argue that allowing Fennelly to occupy this apartment will let her jump to the head of the line for subsidized housing. That misperceives Fennelly’s situation. She was already in subsidized housing when the fire occurred. She is simply seeking to resume the tenancy which was interrupted by the Are.

 Fennelly is not, at this point, entitled to the injunctive relief she seeks — that the defendants allow her to resume occupancy of the apartment immediately. The defendants have counterclaimed for breach of the lease by Fennelly. That claim must be resolved before the court can determine if Fennelly is entitled to reoccupy the apartment. Further, although the court has jurisdiction over the parties before it, the WHA is not a party and the WHA must execute the necessary documents before Fennelly can resume her tenancy.